**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE BLAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18-cv-03673 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| EDWARD D. JONES & CO., L.P., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Wayne Bland, Felicia Slaton-Young, and Nyisha Bell are black financial advisors ("FAs") either currently or formerly employed by Defendant Edward D. Jones & Co., LP. They claim that Defendants Edward D. Jones & Co., LP and The Jones Financial Companies, LLLP (collectively, "Edward Jones") discriminated against them on the basis of their race because the firm employed policies and practices that favored non-black FAs over black FAs. As a result, Plaintiffs were compensated less than their equally or less-qualified non-black counterparts. Plaintiffs, on behalf of themselves and a putative class of similarly-situated current and former black FAs, have brought the present action against Edward Jones for race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. They also assert individual claims for retaliation under Title VII and § 1981. Before the Court are Edward Jones's motions to transfer this case to another venue under 28 U.S.C. § 1406 or § 1404(a) (Dkt. Nos. 37, 39) or, in the alternative, to dismiss the case for failure to state a claim (Dkt. No. 37). For the following reasons, Edward Jones's motion to transfer venue under § 1406 is granted in part, its motion to transfer venue under § 1404(a) denied, and its motion to dismiss is denied.

**BACKGROUND**

## I.  Overview

Edward D. Jones & Co., LP is a financial services firm with over 16,000 FAs providing brokerage, investment advisory, and financial and wealth planning services to individual investors in more than 13,000 locations throughout the United States. (Second Am. Compl. ¶¶ 1, 8, Dkt. No. 33.) It is a wholly owned subsidiary of The Jones Financial Companies, LLLP, which is headquartered in St. Louis, Missouri. (*Id.* ¶ 7.) Almost all of Edward Jones's senior executives are white. (*Id.* ¶ 13.) Approximately 94% of Edward Jones's FAs are white, with minorities such as blacks, Latinos, and Asians comprising the remaining 6%. (*Id.* ¶ 12.) By comparison, the United States Census Bureau reported that 8.1% of financial advisors nationally are black and 21% are minorities. (*Id.*)

From its St. Louis headquarters, Edward Jones exerts centralized control over the firm, and its senior executives issue company policies that apply to all FAs. (*Id.* ¶ 13.) Among those policies is Edward Jones's uniform, nationwide compensation plan. (*Id.*) Specifically, FAs' compensation is based on commissions earned from client accounts and transactions. (*Id.*) Generally, an FA's potential commissions and earnings are positively correlated with the value of the assets managed by the FA. (*Id.*) Moreover, an FA can advance along Edward Jones's compensation model as he or she achieves greater financial success, thereby allowing him or her to reap higher payouts and bonuses. (*Id.*)

According to Plaintiffs, Edward Jones's compensation plan and other policies and practices favor non-black FAs, yielding significant racial disparities in compensation and attrition. (*Id.*) New Edward Jones FAs are assigned one of two paths at the outset of their careers at the firm. (*Id.* ¶ 15.) First, Edward Jones assigns a select number of FAs to either the "Legacy" or

"Goodknight" programs. (*Id.*) FAs who join the Legacy program are given dedicated office space, client assistance from a branch office administrator, and mentoring from an established FA. (*Id.*) Similarly, FAs assigned to the Goodknight program receive dedicated office space, mentorship, and an agreement with an established FA to share assets. (*Id.*) On the other hand, new FAs not assigned to either program are not provided office space and usually work from home and receive minimal other support from Edward Jones. (*Id.*) Thus, FAs who are assigned to the Legacy and Goodknight programs are able to attract more clients and accounts than other FAs, which in turn results in those FAs enjoying greater compensation and success during their careers at the firm. (*Id.*) Black FAs are disproportionately excluded from these programs, and those that are assigned to them do not receive the same support, resources, or business opportunities as non-black FAs. (*Id.*)

Black FAs are also disproportionately relegated to less lucrative territories and locations where clients and prospects have less investable income. (*Id.* ¶ 16.) Specifically, Edward Jones often steers individual FAs to neighborhoods with demographic makeups that match the FA's race. (*Id.*) Edward Jones also maintains policies and practices that disproportionately direct lucrative business opportunities to non-black FAs. (*Id.* ¶ 17.) In particular, the firm reassigns client accounts and redistributes books of business, in whole or in part, when an FA moves offices or leaves the firm. (*Id.*) Yet the larger more lucrative clients and books are assigned to FAs who are not black, costing black FAs compensation and advancement opportunities. (*Id.*) Similarly, when an FA retires, firm policy encourages or directs the retiring FA to select and partner with other Edward Jones FAs to distribute their books of business upon retirement. (*Id.* ¶ 18.) Over a period of time, the retiring FA transitions his or her clients to another FA, allowing that FA to

meet the retiring FA's clients and build a relationship. (*Id.*) Under that policy, retiring FAs overwhelmingly select non-black FAs to inherit their books of business. (*Id.*)

## II. Plaintiff Wayne Bland

Plaintiff Bland, a black FA, had over a decade of experience in the financial services industry when he joined Edward Jones in 2014. (*Id.* ¶¶ 9, 23.) While Bland had asked to prospect in an affluent and predominantly white neighborhood, Edward Jones refused his request and instead assigned a white FA with less experience to that neighborhood. (*Id.* ¶ 24.) Meanwhile, Bland was assigned to prospect in a lower-income neighborhood with a large black population. (*Id.*) Later, Bland learned that the firm knew his assigned territory was not economically viable or capable of sustaining a successful financial advisory business. (*Id.*) In fact, Edward Jones had previously closed an office in the same location for that reason. (*Id.*)

Initially, Bland was not selected for either the Goodknight or Legacy programs. (*Id.* ¶ 25.) Thus, for his first five months at Edward Jones, Bland worked from home, which hindered his ability to attract clients. (*Id.*) Only after he repeatedly requested access to an office or to be included in the Legacy or Goodknight programs did Edward Jones assign Bland to the Legacy program. (*Id.* ¶ 26.) As a result of his assignment, Bland gained access to an office in Lake Wylie, South Carolina. (*Id.*) Yet his office area was also used for storage purposes and contained a dining table, boxes, and office supplies. (*Id.*) Moreover, Bland was still not provided with mentorship, training, and other benefits provided to participants in the Legacy program. (*Id.*) Following the departure of a senior FA at the Lake Wylie office, Edward Jones assigned the office and "the departing FA's tens of millions of dollars in client accounts" to a white FA with less experience than Bland. (*Id.* ¶ 27.) During his time at Edward Jones, the firm routinely assigned valuable

client accounts and books of business to white FAs rather than Bland. (*Id.* ¶ 28.) Bland was also denied administrative and sales support. (*Id.*)

After he observed and was the target of "racially hostile" statements, Bland reported the misconduct to Edward Jones' management. (*Id.* ¶ 29.) Instead of addressing the misconduct, Edward Jones retaliated against Bland by denying him favorable offices, business opportunities, and resources. (*Id.*) Management also subjected Bland to enhanced and differential scrutiny, resulting in his constructive discharge in 2016. (*Id.* ¶ 30.)

### III. Plaintiff Felicia Slaton-Young

Plaintiff Slaton-Young, another black FA, joined Edward Jones in 2013. (*Id.* ¶¶ 10, 31.) She came to the firm with prior experience in the financial services industry, two securities licenses, and a master's degree in Business Administration. (*Id.*) While at the firm, Slaton-Young was denied inclusion in the Legacy and Goodknight programs, managerial support, and mentoring. (*Id.* ¶ 32.) After Slaton-Young obtained two additional securities licenses, Edward Jones assigned her to an office that was already set to be closed. (*Id.* ¶ 33.) The office, which was located in a predominantly black neighborhood on Chicago's South Side, was neither economically viable nor capable of sustaining a successful financial-advisory business. (*Id.*) Later, Slaton-Young was moved to a new location on the South Side of Chicago, as part of what Edward Jones described as a pilot program to place two or more FAs in a single location. (*Id.* ¶ 34.) She was paired with another black FA at the new location. (*Id.*) Again, Slaton-Young's office was in a neighborhood with a large black population and limited investment or client potential and therefore could not support two FAs. (*Id.*)

Furthermore, Slaton-Young was subjected to "racially-charged" remarks by her mentor. (*Id.* ¶ 32.)[1] Upon reporting this conduct to management, she was subjected to unspecified retaliation. (*Id.*) Slaton-Young ultimately had no choice but to leave Edward Jones in late 2017 because of the denial of favorable office locations, valuable client accounts, resources, and support. (*Id.* ¶ 35.)

### IV.    Plaintiff Nyisha Bell

Plaintiff Bell, a third black FA, joined Edward Jones in July 2014, bringing with her experience in the insurance and financial services industries and one securities license. (*Id.* ¶¶ 11, 36.) Nonetheless, she was not assigned to a Legacy or Goodknight program. (*Id.*) Despite lacking significant support from the firm, Bell developed client accounts through her own efforts. (*Id.*) Even after Bell achieved "can-sell status,"[2] Edward Jones continued to assign lucrative business opportunities to non-black FAs instead of Bell. (*Id.* ¶ 37.)

When a longtime FA with around $75 million in client accounts left Edward Jones's Tracy, California office, Bell was told that she would share the office with a white FA. (*Id.*) Yet the bulk of the departing FA's client accounts and book of business went to the white FA while Bell received only a fraction consisting of the smaller and less lucrative accounts. (*Id.*) Furthermore, the white FA was placed in a nicer office and Bell was put in a space previously used as a storage closet. (*Id.*) Bell was also denied managerial support and resources. (*Id.*) In particular, the branch office administrator favored white FAs and their clients over Bell and her clients. (*Id.*) After Bell's complaints to the regional leader were ignored, Bell complained to the

---

[1] The Second Amended Complaint alleges that Slaton-Young was denied mentoring, while at the same time acknowledging that she was assigned a firm-sponsored mentor. While this seems to be a contradiction, viewing the facts in the light most favorable to Plaintiffs, the Court understands Plaintiffs to be claiming that although Slaton-Young was assigned a mentor, the mentor did not actually provide any valuable mentorship.

[2] Plaintiffs do not explain the meaning of this term.

area leader, who conceded that Bell was not treated fairly in comparison to her white counterpart. (*Id.* ¶ 38.)

Bell was eventually assigned to her own office. (*Id.* ¶ 39.) However, the office was "vastly inferior, with no established clients or book of business, or even an exterior Edward Jones sign." (*Id.*) Moreover, Edward Jones allowed white FAs to interfere with and solicit Bell's clients, in contravention of firm policy. (*Id.*) And after an FA left a nearby office, the departing FA's client accounts and assets were assigned to a white FA in another office rather than to Bell. (*Id.* ¶ 40.) Similarly, when a long-established white FA with hundreds of millions of dollars in client assets decided to retire, nearly all of the FA's book of business was transitioned to members of his family who also worked as FAs at Edward Jones. (*Id.* ¶ 41.) The remainder of the book of business was transitioned to the same white FA that was previously assigned assets that could have gone to Bell. (*Id.*) That FA was then relocated, leaving his highly-profitable office available for reassignment. (*Id.* ¶¶ 41–42.) Nonetheless, in spite of Bell's geographic proximity to the office and knowledge of the clients and market, a white FA from another firm in Utah was assigned to the office. (*Id.* ¶ 42.) That FA then poached many of Bell's clients. (*Id.*)

After Bell complained to management about valuable business opportunities being given to white FAs over her, Edward Jones targeted her for retaliation. (*Id.* ¶ 43.) Due to escalating retaliation, Bell felt she had no choice but to leave the firm in August 2018. (*Id.*) A few months later, in November 2018, Bell agreed to return to the firm when Edward Jones promised her $17 million in assets and a shared office in Stockton, California. (*Id.* ¶ 44.) Yet she subsequently learned that the promised assets were not as valuable as represented by Edward Jones. (*Id.*) Currently, Bell does not have either an office or a book of business. (*Id.*)

**DISCUSSION**

Plaintiffs bring the present action on behalf of themselves and a putative class of similarly situated black current and former Edward Jones FAs. Bland and Slaton-Young assert claims under both Title VII and § 1981, whereas Bell currently only brings claims under § 1981. Together, Plaintiffs allege that Edward Jones's racially-discriminatory policies and practices inhibited their ability to develop a successful practice, which, in turn, diminished their compensation in comparison to the compensation of non-black FAs. Edward Jones seeks to transfer this case to another venue pursuant to either 28 U.S.C. § 1406(a) or 28 U.S.C. § 1404(a). In the alternative, Edward Jones moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## I.    Motion to Transfer Venue Under § 1406(a)

While Edward Jones does not dispute that venue is proper in the Northern District of Illinois as to Slaton-Young, it nonetheless argues that venue is improper in this District with respect to Bland and Bell. Consequently, Edward Jones asserts that the entire action should be transferred to the Eastern District of Missouri, which would be a proper venue for all three Plaintiffs.

Under 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Transfer under this statute "is appropriate only when venue is improperly laid." *In re LimitNone, LLC*, 551 F.3d 572, 575 (7th Cir. 2008). Normally, venue is evaluated under the general venue statute, 28 U.S.C. § 1391. However, venue in Title VII cases is governed by Title VII's exclusive venue provision, which provides that a Title VII action

> may be brought in any judicial district in the State in which the unlawful
> employment practice is alleged to have been committed, in the judicial district in
> which the employment records relevant to such practice are maintained and
> administered, or in the judicial district in which the aggrieved person would have
> worked but for the alleged unlawful employment practice, but if the respondent is
> not found within any such district, such an action may be brought within the
> judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3). "Although Title VII has four venue provisions, the plaintiff need only

establish that venue is proper under one of them." *Powell v. Sparrow Hosp.*, No. 09 C 3239, 2010

WL 582667, at *2 (N.D. Ill. Feb. 12, 2010). Moreover, where a plaintiff brings both Title VII and

§ 1981 claims, Title VII's special venue provision governs the § 1981 claims as well. *Mandewah*

*v. Wis. Dep't of Corr.*, No. 07C0410, 2007 WL 4302790, at *1 (E.D. Wis. Dec. 6, 2007) ("Section

2000e-5(f)(3) is a special venue statute, which governs Title VII claims and claims brought under

statutes without special venue provisions where, as here, such claims are joined with a Title VII

claim."); *Strategic Mgmt. Harmony, LLC v. Enhanced Bus. Reporting Consortium, Inc.*, No. 4:05-

cv-00180-JDT-WGH, 2007 WL 2316484, at *5 (S.D. Ind. Aug. 10, 2007) ("Where . . . Title VII

violations are alleged along with another federal claim, Title VII's strict venue requirements take

precedent over the general venue provisions . . . ."); *Bell v. Woodward Governor Co.*, No. 03 C

50190, 2004 WL 1498145, at *1 (N.D. Ill. July 2, 2004) ("Section 5(f)(3) is the exclusive venue

provision for all Title VII discrimination actions, taking priority over the venue provisions of

other discrimination actions that are pled.").

Plaintiffs in this case do not appear to disagree that the Eastern District of Missouri would

be a proper venue for Bland and Slaton-Young's Title VII claims, as Edward Jones maintains the

relevant employment records at its St. Louis headquarters. On the other hand, only Slaton-Young

can establish that venue is proper in the Northern District of Illinois. Because Slaton-Young

worked in Chicago, she would have worked here but for the unlawful employment practice. By

contrast, Bland worked for Edward Jones in North Carolina and South Carolina. Thus, he cannot establish that he would have worked in this District but for the unlawful employment practice. Furthermore, because he never worked in the Northern District of Illinois, he cannot claim to have suffered an unlawful employment practice here.

Despite the fact that Bland cannot establish the applicability of any of the four Title VII venue provisions, Plaintiffs nonetheless assert that he may maintain his action here because Slaton-Young's claims are properly venued. Specifically, he argues that there is no requirement that all named plaintiffs in a Title VII class action satisfy Title VII's venue requirements. While the Seventh Circuit has never squarely addressed this issue, numerous other courts have held that each named plaintiff in a class action must individually satisfy the applicable venue requirements. *E.g.*, *Abrams Shell v. Shell Oil Co.*, 343 F.3d 482, 490 (5th Cir. 2003); *Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 13 (D.D.C. 2003); *Dukes v. Wal-Mart Stores, Inc.*, No. C01-2252 MJJ, 2001 WL 1902806, at *5 (N.D. Cal. Dec. 3, 2001); *see also Allen v. Isaac*, 99 F.R.D. 45, 57 (N.D. Ill. 1983) (rejecting intervention where venue would not be proper for intervenors, noting the lack of "authority for the proposition that venue rules apply only to the original named plaintiffs and not to intervening, later-named plaintiffs"). Those cases explain that the "central function of venue generally is to regulate the forum in which a party may appear or may force another party to appear personally, in a suit in which the court would otherwise have jurisdiction. Venue is therefore intimately connected to and predicated upon the personal appearance of the party." *Quarles*, 260 F. Supp. 2d at 13 (internal quotation marks and alterations omitted). Consequently, "[i]t is therefore logical that plaintiffs who are named representatives of a class be required to satisfy the venue requirements of [Title VII] because they are the parties who have

brought themselves before the court and are persons over whom the court must have jurisdiction." *Id.*

In response, Plaintiffs point to *Byas v. Union Pacific Railroad Co.*, No. 06-cv-0475-MJR, 2007 WL 1021976 (S.D. Ill. Apr. 3, 2007), and *Slaughter v. Wells Fargo Advisors, LLC*, No. 13-cv-06368 (N.D. Ill. Mar. 13, 2014) (Dkt No. 28), as instances where transfer was denied even though not all named plaintiffs were properly venued in the District. However, in *Slaughter*, the court provided no explanation for its denial of the motion. Rather, the motion was summarily denied by way of a brief minute entry. Moreover, the motion to transfer itself did not concern Title VII's special venue provision and did not raise an argument concerning whether an improperly venued plaintiff could serve as a named plaintiff in a class action. Def.'s Mem. in Supp. of Mot. to Transfer *Slaughter*, No-cv-06368 (Mar. 10, 2014), Dkt. No. 26. And in *Byas*, the defendant does not appear to have argued that venue was improper because one of the three named plaintiffs was not properly venued in the District. It only claimed that there was no venue in the District because the properly venued plaintiffs did not file an EEOC charge and receive a right-to-sue letter and could therefore not serve as named plaintiffs in the class action. *Byas*, 2017 WL 1021976, at *2 ("In essence, [the defendant] asserts that each person who is named as a representative of a class must individually comply with the requirements of Section 2000e-5 of Title VII."). Thus, the district court noted in passing that there was venue because two of the plaintiffs were properly venued in the District but focused its analysis on the defendant's core argument, which it rejected. *Id.* at *2–4. . By contrast, those cases finding that all named plaintiffs must individually establish venue tend to provide in-depth analyses of the issue before reaching that conclusion. *See, e.g.*, *Quarles*, 260 F. Supp. 2d at 9–14; *Dukes*, 2001 WL 1902806, at *2–5. In short, this Court finds the decisions requiring all named plaintiffs to establish venue to be

persuasive. Consequently, the Court concludes that Bland's claims are improperly venued in this District.

If venue over Bell's claims was to be evaluated under Title VII's venue provision, this Court would find venue to be improper. Bell, like Bland, never worked in the Northern District of Illinois. Instead, she worked entirely in California. Yet Bell currently asserts only § 1981 claims. Plaintiffs have represented that they will amend the complaint to include Bell's Title VII claims once she receives her right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). (Second Am. Compl. at 18 n.9.) Edward Jones argues that because of the impending amendment, the Court should evaluate venue as to Bell under Title VII. The Court cannot agree that venue should be evaluated based on a claim that is not currently set forth in the operative complaint. Thus, venue for Bell will be evaluated under the general venue statute.

The relevant provisions of 28 U.S.C. § 1391(a) state that venue is appropriate in either "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Here, because Bell was employed in California during her entire Edward Jones career and Edward Jones policies and practices were devised and implemented in St. Louis, this District is not a judicial district in which a substantial part of the events giving rise to Bell's claim occurred. However, Plaintiffs contend that Edward Jones is a resident of Illinois.

The general venue statute provides that a business is a resident "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Thus, because Edward Jones has 665 branch offices in Illinois and employs more FAs in Illinois than in any other state, including Missouri, (Pls.' Opp'n

to Mot. to Transfer Venue at 2, Dkt. No. 52), this Court indisputably has personal jurisdiction over it. Edward Jones responds that while this Court may have personal jurisdiction over Defendant Edward D. Jones & Co., LP, Plaintiffs have not shown that it also has personal jurisdiction over its parent, co-Defendant The Jones Financial Companies, LLLP. Thus, venue is inappropriate, notwithstanding Edward D. Jones & Co., LP's residency in this District because § 1391(a) allows for venue to be had in a judicial district in which any defendant resides, but only if *all* defendants are residents of the State in which the district is located. And it is plaintiff's burden to establish venue. *Wakley v. Frontera Produce, Ltd.*, No. 13 C 5597, 2014 WL 12767672, at *1 (N.D. Ill. Jan. 15, 2014). Neither the Second Amended Complaint nor Plaintiffs' brief in opposition to the motion to transfer venue contain any facts showing this Court's personal jurisdiction over The Jones Companies, LLLP, specifically.

However, Plaintiffs assert that Edward Jones has waived its right to argue a lack of personal jurisdiction as to both Edward D. Jones & Co., LP and The Jones Financial Companies, LLLP, by failing to file a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) concurrent with its motion to dismiss for failure to state a claim presently before this Court. In support of its argument, Plaintiffs cite simply to Rule 12(h)(1), which provides that certain Rule 12 defenses, including improper venue and lack of personal jurisdiction, are waived by failing to raise them in a Rule 12 motion. Yet, another court in this district recently deemed the same argument, also only supported by citation to Rule 12(h)(1), waived due to insufficient citation to legal authority. *Kaiser v. Monroe Clinic, Inc.*, No. 18 C 50118, 2019 WL 1759877, at *3 (N.D. Ill. Apr. 19, 2019). That district court further noted that the court in *Wakley v. Frontera Produce, Ltd.*, 2014 WL 12767672 (N.D. Ill. Jan. 15, 2014), "found that the fact a defendant had not challenged personal jurisdiction did not mean the court had

personal jurisdiction over that defendant for purposes of determining residence under the venue statute." *Kaiser*, 2019 WL 1759877, at \*3. Just as in *Kaiser*, this Court finds that Plaintiffs' waiver argument is underdeveloped and is therefore itself waived.[3]

That leaves Plaintiffs' claim that Edward Jones has subjected itself to this Court's personal jurisdiction because it has availed itself of this forum by suing others here. However, Plaintiffs cite a case in which only Edward D. Jones & Co, LP is a Plaintiff. Again, they failed to satisfy their burden of establishing venue as to The Jones Financial Companies, LLLP. Thus, Plaintiffs have failed to establish that this District is a proper venue for Bell's § 1981 claims.

Because Bland and Bell's claims are improperly venued in the Northern District of Illinois, the Court must determine whether to grant Edward Jones's request to transfer the case to the Eastern District of Missouri. Under § 1406(a), when a case is brought in the wrong venue, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could be brought." While the Court has discretion to determine whether to

---

[3] The Court's conclusion is reinforced by the opposing views among courts on the issue of whether failure to file a motion to dismiss for lack of personal jurisdiction concurrent with any other Rule 12(b) motion waives the right to contest residency under § 1391(c)(2). *Compare Wakley*, 2014 WL 12767672, at \*1, *Rankel v. Kabateck*, No. 12 CV 216(VB), 2013 WL 7161687, at \*3 (S.D.N.Y. Dec. 9, 2013) ("[T]he existence of venue should be analyzed as of the time of filing, without regard to whether a defendant may waive a defense based on lack of personal jurisdiction by virtue of its conduct during litigation." (internal quotation marks omitted)), *and Fractional Villas, Inc. v. Tahoe Clubhouse*, No. 08cv1396-IEG-POR, 2009 WL 465997, at \*4 (S.D. Cal. Feb. 25, 2009) ("To show proper venue, plaintiff must show at the time the case was commenced that [the defendant] was found, or resided in, the Southern District of California. Therefore, [the defendant's] subsequent waiver of personal jurisdiction has no impact on the Court's analysis."), *with Imperial Crane Servs., Inc. v. Cloverdale Equip. Co.*, No. 13 C 04750, 2013 WL 5904527, at \*4 n.7 (N.D. Ill. Nov. 4, 2013) ("By filing the present motion [to dismiss for improper venue] without previously or contemporaneously filing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, [the defendant] has waived that defense."), *and Frederick Goldman, Inc. v. Commemorative Brands, Inc.*, No. 04 Civ.1100(LTS)(THK., 2004 WL 954692, at \*1 (S.D.N.Y. May 5, 2004) (denying motion to dismiss for improper venue because the defendant did not contest personal jurisdiction and thus "by not raising it in his Rule 12(b) motion, has, pursuant to Rule 12(h)(1)(A) . . . waived any lack of personal jurisdiction defense"). Given the opposing positions taken by courts regarding this issue, Plaintiffs should have come forward with some authority and provided more than a single conclusory sentence in arguing their position. And unlike Plaintiffs, Edward Jones did cite to authority to argue against waiver. (*See* Defs.' Consolidated Reply in Supp. of Mot. to Transfer at 9 n.6, Dkt. No. 60.)

transfer or dismiss, "the presumption generally runs in favor of transfer." *MB Fin. Bank, N.A. v. Walker*, 741 F. Supp. 2d 912, 919 (N.D. Ill. 2010). Transfer is particularly appropriate where "dismissal will endanger the plaintiff's claims under the applicable statute of limitations." *Id.* Here, the statute of limitations is particularly salient with respect to Bland, as a Title VII action must be filed within 90 days of receiving a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1); *Johnson v. United Airlines, Inc.*, No. 12 C 5842, 2013 WL 323404, at *7 (N.D. Ill. Jan. 25, 2013). Bland initiated this lawsuit on May 24, 2018, and thus his Title VII claims would likely be time-barred if his claims were dismissed and he is forced to re-file.

While transfer might appear to be the more equitable action, a court facing a similar situation found that where one of the named plaintiffs was properly venued, it would defer ruling on whether to dismiss or transfer the improperly venued plaintiffs. *Quarles*, 260 F. Supp. 2d at 14. It determined that deferring was the proper course because if class certification were later granted, the improperly venued named plaintiffs could be dismissed while remaining as unnamed members of the class. *Id.* On the other hand, if class certification were denied, it would then be appropriate to transfer the action to the appropriate district. As will be explained more fully below, the Court will not transfer Slaton-Young's claims under § 1404(a), and it denies the motion to dismiss as to her race discrimination claims. Her action may continue in this District, and presumably the class certification issue will be addressed. Nonetheless, the Court is cognizant that deferring a decision on the fate of Bland and Bell's improperly venued claims may not be the most efficient approach and could cause unnecessary delay, given that this action is still at an early stage.

Another approach is the one taken by the district court in *LaGuardia v. Designer Brands, Inc.*, No. 19cv1568 JM(BLM), 2020 WL 2463385 (S.D. Cal. May 7, 2020), which faced very similar circumstances to those here. In *LaGuardia*, the district court found that venue was

improper as to three of the named plaintiffs in a class action, whereas it was proper for one named plaintiff. As to the three named plaintiffs for whom venue was improper, the district court severed their claims and transferred them to a district where venue would be proper. *Id.* at *6.[4] Such an approach would allow Bland and Bell to proceed with their claims without any further delay. Yet, in a hearing, Plaintiffs' counsel indicated Plaintiffs' strong preference to proceed together in the same case while insisting that such a case could be litigated in the Northern District of Illinois. For the reasons discussed above, that is not an option available to Plaintiffs. If they would like to proceed together in a single case, that case must be heard in the Eastern District of Missouri. Alternatively, as will be explained below, because the § 1404(a) factors do not compel transfer as to Slaton-Young, she may proceed in this District, just without Bland and Bell. Finally, the Court could simply defer the decision like the *Quarles* court.

Although Plaintiffs have expressed that neither of the three options are ideal, the Court has now definitively ruled out their preferred outcome of all three Plaintiffs proceeding together in this District. The Court believes it is reasonable to allow Plaintiffs the opportunity to provide input on how they would like to proceed. Thus, Plaintiffs shall advise this Court by December 14, 2020 of its preference among the following options: (a) severance and transfer of Bland and Bell's claims to the Eastern District of Missouri; (b) transfer of the entire case to the Eastern District of Missouri; or (c) the deferring the decision to dismiss or transfer Bland and Bell's claims until after class certification.

## II.     Motion to Transfer Venue Under § 1404(a)

Because venue is appropriate as to Slaton-Young, her claims cannot be transferred under § 1406(a). *See LimitNone*, 551 F.3d at 575 ("Transfer under § 1406(a) is appropriate only when

---

[4] Unlike here, the *LaGuardia* court ultimately decided transfer was also warranted under § 1404(a) as to the properly venued plaintiff and transferred the entire action. *LaGuardia*, 2020 WL 2463385, at *6–9.

venue is improperly laid."). Thus, Edward Jones also moves to transfer this case pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Under that statute, a case may be transferred if: "(1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Johnson*, 2013 WL 323404, at *3. As discussed above, venue is proper for Slaton-Young's claims in both the Northern District of Illinois and the Eastern District of Missouri. Thus, the Court must determine whether transferring her claims to the Eastern District of Missouri satisfies the convenience and interest of justice factors. It is the moving party's burden to establish that the transferee forum is more convenient. *Moore v. Motor Coach Indus., Inc.*, 487 F. Supp. 2d 1003, 1006 (N.D. Ill. 2007). Moreover, in undertaking this inquiry, the balance of factors considered by the court must heavily weigh in favor of transfer. *Id.*

### A. Convenience of the Parties and Witnesses

In undertaking the convenience analysis, the Court looks to five factors: "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties." *Johnson*, 2013 WL 323404, at *4. The Court addresses each factor in turn.

### 1. Plaintiff's Choice of Forum

Generally, a plaintiff's choice of forum is given substantial weight, especially when the chosen forum is the plaintiff's home forum. *Rosen v. Spirit Airlines, Inc.*, 152 F. Supp. 3d 1055, 1059 (N.D. Ill. 2015). Yet in putative class actions, many courts discount this weight. *E.g.*, *Rosen*, 152 F. Supp. 3d at 1060; *Jaramillo v. DineEquity, Inc.*, 664 F. Supp. 2d 908, 914 (N.D. Ill. 2009).

*But see AL & PO Corp. v. Am. Healthcare Capital, Inc.*, No. 14 C 1905, 2015 WL 738694, at *2–3 (N.D. Ill. Feb. 19, 2015). That is because where the named plaintiff seeks to represent a nationwide class, "if class certification occurred, the named [plaintiff's] choice of venue will not be the home venue for all plaintiffs and any venue selected is bound to be inconvenient to some plaintiffs." *Jaramillo*, 664 F. Supp. 2d at 914. Following the lead of the many courts in this District that have taken this approach, *AL & PO Corp.*, 2015 WL 738694, at *2 (listing cases), Slaton-Young's choice of forum will be given some weight, but that weight will be reduced because she seeks to represent a nationwide class.

### 2. Situs of Material Events

Edward Jones argues that material events in this action involve uniform, firm-wide policies and practices that were originated in and promulgated from its St. Louis headquarters. On the other hand, Plaintiffs argue that this District is a relevant situs of material events because those policies were imposed on and harmed Slaton-Young and many other black FAs in Illinois. Both Edward Jones's and Plaintiffs' contentions are properly considered in the analysis. *See Perry v. Cable News Network, Inc.*, No. 14 C 1194, 2014 WL 4214873, at *2 (N.D. Ill. Aug. 25, 2014) ("The situs of material events depends both on the conduct of the defendants and on those who feel the effects of the conduct."). Indeed, courts recognize that the location where a company devises its policies and procedures is a relevant situs of material events. *See, e.g., AL & PO Corp.*, 2015 WL 738694, at *3; *Lafleur v. Dollar Tree Stores, Inc.*, No. 1:11 CV 8473, 2012 WL 2280090, at *4. At the same time, in Title VII actions, "the location where the employee suffered from the unlawful employment practice is a key situs of material events." *Williams v. Am. Coll. of Educ., Inc.*, No. 16-cv-11746, 2017 WL 2424227, at *6 (N.D. Ill. June 5, 2017). In non-class actions, many courts have found that the fact that a plaintiff suffered the unlawful discrimination

in his or her chosen district weighs slightly against transfer. *See, e.g.*, *id.* However, in a putative

class action involving a nationwide class, the injury is not concentrated solely in the judicial

district where the named plaintiff felt the effects of corporate decisions. Rather, it is spread

throughout the country. *See Sojka v. DirectBuy, Inc.*, No. 12 C 9809, 2014 WL 1089072, at *2

(N.D. Ill. Mar. 18, 2014) (finding that the effects of decisions made from corporate headquarters

were felt across the country where the putative class members lived); *Lafleur*, 2012 WL 2280090,

at *4 ("Although the two named Plaintiffs worked in Illinois, the significance of their [injury]

here is diluted by the existence of thousands of other locations where similar events occurred.").

Thus, the situs of events is not concentrated in either this District or the Eastern District of

Missouri and this factor is neutral. *See AL & PO Corp.*, 2015 WL 738694, at *3; *Nathan v.*

*Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *19 (N.D. Ill.

May 22, 2012).

### 3. Relative Ease of Access to Sources of Proof

Plaintiffs do not appear to dispute that because they challenge Edward Jones's nationwide

policies and its senior executives' decisionmaking, the majority of the relevant sources of proof

are housed in Edward Jones' St. Louis headquarters. However, courts generally disregard this

factor because these days "documents are presumed to be easily transportable and their location

need not dictate the location of the litigation." *Nathan*, 2012 WL 1886440, at *19. And Edward

Jones does not point to any special circumstances that would lead this Court to conclude

otherwise. Thus, this factor is neutral.

### 4. Convenience of the Parties

Neither the Northern District of Illinois nor the Eastern District of Missouri will be equally

convenient to both parties. Slaton-Young lives in this District, so keeping her claims here will be

more convenient for her. Conversely, Edward Jones is headquartered in St. Louis, so transferring will be more convenient to it. As the party seeking transfer, Edward Jones must show not only that this forum is inconvenient to it, but also that the Eastern District of Missouri does not significantly inconvenience Slaton-Young. *Lafleur*, 2012 WL 2280090, at *4. However, the mere fact of litigating in a forum in which she does not reside does not mean that Slaton-Young will suffer a significant inconvenience from transfer. *See id.* Nonetheless, "[w]hen plaintiff and defendant are in different states there is no choice of forum that will avoid imposing inconvenience; and when the inconvenience of the alternative venues is comparable there is no basis for a change of venue; the tie is awarded to plaintiff." *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 665 (7th Cir. 2003). Here, at most, the inconveniences are comparable and the tie favors keeping the case in this District. The Court further weights this factor in Slaton-Young's favor because the travel and additional expenses incurred by litigating in a foreign forum present a greater burden to an individual plaintiff as opposed a large company like Edward Jones. *See Perry*, 2014 WL 4214873, at *3.

In opposing transfer, Plaintiffs also admit that this District was chosen because it is the most convenient for Plaintiffs' counsel. Generally, "consideration of the convenience of Plaintiff's counsel is not an appropriate factor to consider when evaluating transfer." *Body Sci. LLC v. Boston Sci. Corp.*, 846 F. Supp. 2d 980, 993 (N.D. Ill. 2012). It may only be considered where convenience of counsel bears directly on the costs of litigation. *Ambrose v. Steelcase, Inc.*, No. 02 C 2753, 2002 WL 1447871, at *2 n.3 (N.D. Ill. July 3, 2002); *see also Household Reinsurance Co. v. Travelers Ins. Co.*, No. 91 C 1308, 1991 WL 119121, at *2 (N.D. Ill. June 28, 1991) ("[C]onvenience of counsel should rarely, if ever, enter into [the court's] consideration of the proper venue."). Plaintiffs contend that transfer would impose costs because their counsel is

20

not admitted to practice law in the Eastern District of Missouri and would have to travel to attend routine status hearings. But Plaintiffs make no showing that such costs are so substantial as to warrant this Court departing from the normal rule against considering the convenience of counsel. *See Boyd v. Snyder*, 44 F. Supp. 2d 966, 972 (N.D. Ill. 1999) (declining to consider counsel's additional litigation expenses resulting from transfer where the additional expenses would not force the plaintiff to terminate the litigation). Indeed, Plaintiffs' assertion regarding travel costs for status hearings is particularly unavailing given their offer to depose Edward Jones's witnesses in St. Louis. Thus, while the convenience of parties factor favors Slaton-Young, the Court gives it no additional weight based on this District's convenience to her counsel.

### 5. Convenience of the Witnesses

Often, the convenience of the witnesses is the most important factor in the transfer analysis. *Rosen*, 152 F. Supp. 3d at 1061. However, "the convenience of witnesses who are within a party's control, such as a party's employees, is far less important than the convenience of non-party witnesses." *AL & PO Corp.*, 2015 WL 738694, at *4. In their initial disclosures, nearly all potential witnesses identified by Plaintiffs are current and former Edward Jones executives, corporate representatives, management, and human resources representatives who worked out of Edward Jones's St. Louis headquarters. (*See* Defs.' Mot. to Transfer Pursuant to 28 U.S.C. § 1404(a), Ex. 2, Dkt. No. 39-2.) Plaintiffs contend that because these are party witnesses, their convenience should be disregarded. However, Plaintiffs are incorrect that the convenience of party witnesses is irrelevant. While courts do give greater consideration to the convenience of non-party witnesses as opposed to party witnesses, the convenience of party witnesses nonetheless matters in the analysis. *See First Nat'l Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 913 (N.D. Ill. 2006) ("Party witnesses are certainly given some weight . . . ."). Here, no party has

identified any non-party witnesses at this point. Thus, only the convenience of party witnesses can be considered.

Plaintiffs intend to call numerous witnesses from Edward Jones. Indeed, the only non-Edward Jones witnesses identified by Plaintiffs are themselves and other potential class members. In weighing the convenience of each parties' witnesses, the "Court must go beyond just tallying [the number of witnesses] in each District, and instead examine the nature and quality of their testimony with respect to the issues in the case." *Rosen*, 152 F. Supp. 3d at 1061. Here, certainly the Northern District of Illinois is more convenient to Slaton-Young. Moreover, her testimony will likely be of key importance to the case. At the same time, other potential class member witnesses will likely come from all over the country and there is no reason to believe that this District would be any more convenient for them than the Eastern District of Missouri. On the other hand, it is likely that most or all of the Edward Jones's witnesses will come from the Eastern District of Missouri. Similarly, it is highly likely that more than one of them will be necessary to provide testimony concerning the firm's various policies and procedures and their implementation. Thus, the Court finds that the convenience of the witnesses factor favors transfer.

### B.    Interest of Justice

In addition to the convenience of parties and witnesses, courts also consider the interest of justice in determining whether to transfer. Indeed, the interest of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Rosen*, 152 F. Supp. 3d at 1062. The underlying interest of justice factors concern "the efficient functioning of the court." *Lafleur*, 2012 WL 2280090, at *6. Among the factors considered in the analysis are "docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective

desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010).

The one interest of justice factor that favors transfer is the speed to trial factor. Courts frequently evaluate this factor by referring to statistics from the United States District Courts National Judicial Caseload Profile. *See AL & PO Corp.*, 2015 WL 738694, at *5. In particular, two statistics are considered: "(1) the median number of months from filing to disposition for civil cases and (2) the median number of months from filing to trial for civil cases." *Id.* Here, this Court looks to the March 2020 report. *See* United States District Courts–National Judicial Caseload Profile, March 2020, *available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2020.pdf. For civil cases in the Northern District of Illinois, the median time from filing to disposition is 9.8 months, as of March 31, 2020. The median time from filing to trial is 39.0 months. By contrast, in the Eastern District of Missouri, the median time from filing to disposition is 2.3 months as of March 31, 2020, and the median time from filing to trial is 33.5 months as of March 31, 2019.[5] Thus, the speed to trial factor favors transfer.

However, the remaining interest of justice factors are neutral. Because Plaintiffs' Title VII and § 1981 claims are federal claims, both districts are equally familiar with the applicable law. *Johnson*, 2013 WL 323404, at *6. And, as to the desirability of resolving controversies in each locale and the relationship of each community to the controversy factors, for a nationwide class

---

[5] The March 31, 2020 United States District Courts National Judicial Caseload Profile did not have an updated median time from filing to trial number for the Eastern District of Missouri. Thus, the Court uses the number as of March 31, 2019.

action "there is no compelling community interest that would be preserved by the selection of one venue over another." *Jaramillo*, 664 F. Supp. 2d at 917. Thus, these factors are also neutral.

### C.    Balance of Factors

Together, the balance of factors is neutral. On Slaton-Young's side of the ledger is the fact that the Northern District of Illinois is her chosen forum, although that factor is given less weight because she seeks to represent a nationwide class. In addition, this District is slightly more convenient to the parties. Weighing in Edward Jones's favor is the fact that the Eastern District of Missouri is more convenient to the witnesses. Furthermore, the only non-neutral interests of justice factor, speed to trial, also favors transfer. Together, the balance of factors is neutral at best. Most of the factors are simply neutral, and even the factors favoring Edward Jones are not entitled to substantial weight and are counterbalanced by those factors favoring Slaton-Young. Consequently, the Court declines to transfer venue as to Slaton-Young's claims because the balance of factors do not weigh heavily in favor of transfer.

### III.    Motion to Dismiss for Failure to State a Claim

Because the Court declines to transfer Slaton-Young's claims, it proceeds to Edward Jones's motion to dismiss. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In evaluating Edward Jones's motion, the Court considers only Slaton-Young's allegations and those allegations common to the class, as it has already determined that Bland and Bell's claims were not brought in the proper venue. Edward Jones asserts that Slaton-Young's Title VII claims should be dismissed because her EEOC charge was insufficient to support her claims in this lawsuit. Even if her EEOC charge were sufficient, Edward Jones argues that her claims are time-barred under Title VII's statute of limitations. Finally, Edward Jones contends that both the Title VII and § 1981 claims should be dismissed because they are insufficiently pleaded.

### A.    Sufficiency of the EEOC Charge

Edward Jones first argues that Slaton-Young's claims should be dismissed because she did not provide sufficient detail concerning Edward Jones's alleged discrimination in her EEOC charge. Generally, any claim a plaintiff brings in a Title VII lawsuit must have been previously alleged in the plaintiff's EEOC charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "This exhaustion rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employee some warning of the conduct about which the employee is aggrieved." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 902 (N.D. Ill. 2011). It is not necessary that a Title VII plaintiff allege in her EEOC charge "each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500. Rather, it is sufficient if the Title VII complaint sets forth claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.*

As an initial matter, Edward Jones argues that Slaton-Young cannot "piggyback" on the allegations in Bland's EEOC charge because she received her own right-to-sue letter. *See*

*McQueen*, 803 F. Supp. 2d at 905 (finding that where one plaintiff has timely filed his own administrative charge, he cannot rely on a co-plaintiff's administrative charge to satisfy the exhaustion requirement). The Court declines to address this issue, however, because Slaton-Young's EEOC charge, standing alone, is sufficient to satisfy Title VII's exhaustion requirement. While Edward Jones claims that the allegations in Slaton-Young's charge are vague and fail to refer to specific events, the Court finds that characterization inaccurate. Indeed, Slaton-Young's EEOC charge describes numerous examples of discrimination that correspond exactly with the allegations in her complaint. Specifically, it states that Slaton-Young was not admitted to the Legacy and Goodknight programs, was assigned to territories that were not economically viable, was denied lucrative client accounts and books of business on account of her race, and was retaliated against for making a complaint about race discrimination. (Defs.' Mot. to Transfer Venue, or, Alternatively, to Dismiss, Ex. 3, Dkt. No. 38-4.) The Court finds that the allegations in Slaton-Young's EEOC charge were more than sufficient to both give Edward Jones notice of the nature of claims against it and to allow the EEOC the opportunity to settle the dispute.

### B.     Timeliness of Title VII Claims

According to Edward Jones, Slaton-Young's Title VII claims must be dismissed because each discrete act of discrimination that she alleges in the Second Amended Complaint was time-barred.

"A Title VII plaintiff normally must first file a charge with the EEOC within a specified period of time after the challenged employment action occurs." *Adams*, 742 F.3d at 729. Where a state, like Illinois, has an agency empowered to address employment discrimination, the EEOC charge must be filed within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also Stuart v. Local 727, Int'l Bhd. of Teamsters*, 771 F.3d 1014,

1017 (7th Cir. 2014). An "unlawful employment practice" has been interpreted "to apply to a discrete act or single 'occurrence' even when it has a connection to other acts." *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101, 111 (2002). And "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. Thus, the EEOC charge "must be filed within the . . . 300-day time period after the discrete discriminatory act occurred." *Id.* Any discrete act that falls outside that 300-day window is time-barred, and while it may serve as background evidence in support of a timely claim, it cannot itself be a basis for the employer's liability. *Id.* at 113–14.

Slaton-Young filed her EEOC charge on September 14, 2018. (Defs.' Mot. to Transfer Venue, or, Alternatively, to Dismiss, Ex. 3.) Thus, her charge covered discrimination suffered in the preceding 300 days—or on November 18, 2017 or later. Yet Slaton-Young alleges that she was constructively discharged on December 3, 2017.[6] (Second Am. Compl. ¶ 10.) And so presumably, she did not suffer a discrete act of discrimination after that date. Thus, the window of time during which Slaton-Young would have to have suffered a discrete discriminatory act runs from November 18, 2017 (the earliest date covered by her EEOC charge) to December 3, 2017 (the date when she claims to have been constructively discharged). Put another way, Slaton-Young must have suffered a discrete discriminatory act in the fifteen days prior to her discharge.

Edward Jones argues that Slaton-Young's Title VII claims are time-barred because the allegations in the EEOC charge and the Second Amended Complaint do not include pertinent details, including the dates of any discrete discriminatory acts that occurred during this fifteen-day window. Of course, the statute of limitations is an affirmative defense that a plaintiff's complaint

---

[6] December 3, 2017 is the date Slaton-Young listed in her EEOC charge as the latest date that Edward Jones discriminated against her. Further, her charge claims that she was "unlawfully constructively discharged" in December 2017, thus it is fair to infer that her discharge occurred on December 3, 2017. (Defs.' Mot. to Transfer Venue, or, Alternatively, to Dismiss, Ex. 3.)

need not anticipate or overcome. *Padron v. Wal-Mart Stores, Inc.*, 783 F. Supp. 2d 1042, 1051 (N.D. Ill. 2011). Nonetheless, a complaint may be dismissed on statute of limitations grounds when a plaintiff "pleads facts that establish all of the elements of that defense." *Id.*

Instead of claiming that the Second Amended Complaint does not conclusively establish the applicability of the statute of limitations defense, Slaton-Young claims that she need not plead any discrete act occurring within the limitations period because her claim is that Edward Jones maintains a discriminatory compensation system and is therefore governed by the Lily Ledbetter Fair Pay Act of 2009 ("Ledbetter Act"), 42 U.S.C. § 2000e-5(e)(3)(A). The Ledbetter Act provides that "the statute of limitations for filing an EEOC charge alleging pay discrimination resets with each paycheck affected by a discriminatory decision." *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1025 (7th Cir. 2011).

Ultimately, the Court declines to resolve the statute of limitations issue at this time. Even if the Ledbetter Act does not apply, at the motion to dismiss stage "the question is whether there is any set of facts that if proven would establish a defense to the statute of limitations." *Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003). While many of the allegations in the EEOC charge and the Second Amended Complaint relate to acts that almost certainly occurred outside the 300-day window, such as allegations relating to Slaton-Young's training and initial office assignment, there are still certain discriminatory acts that could have occurred in the fifteen days before the end of Slaton-Young's employment. For example, she complains that Edward Jones assigned lucrative client accounts to FAs who were not black, resulting in lower compensation for black FAs. It is entirely possible that such an account was assigned to a white FA during the limitations period. While it is perhaps unlikely that such a discrete act occurred during the limitations period, it is not entirely foreclosed by the allegations in the EEOC charge and the

Second Amended Complaint. For that reason, dismissal on statute of limitations grounds is not appropriate at this stage.

### C.    Intentional Discrimination Claims

Through its policies that resulted in black FAs being bypassed for lucrative business opportunities, Slaton-Young claims that Edward Jones has engaged in a nationwide pattern and practice of intentional discrimination. Under both Title VII and § 1981, a plaintiff may state a claim for disparate racial treatment by plausibly alleging that she was subject to intentional discrimination because of her race. *Murdock-Alexander v. Tempsnow Emp't*, No. 16-cv-5182, 2016 WL 6833961, at *6 (N.D. Ill. Nov. 21, 2016). This has been described as a "minimal pleading standard." *Flanagan v. Excel Staffing Sols., LLC*, No. 16-CV-05653, 2018 WL 558499, at *3 (N.D. Ill. Jan. 25, 2018). One means of proving intentional discrimination is by showing that an employer has a pattern or practice of discriminating against a protected class. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716–17 (7th Cir. 2012). "Pattern-or-practice claims require a showing that an employer regularly and purposefully discriminates against a protected group." *Id.* at 716 (internal quotation marks omitted). Specifically, a plaintiff must "prove that discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* (internal quotation marks omitted).

Edward Jones claims that the Second Amended Complaint is conclusory in pleading a pattern or practice of discrimination. It argues that Slaton-Young cannot simply allege her membership in a protected class and that unidentified decisionmakers were motivated by bigotry. Critically, in a disparate treatment claim, the plaintiff need only allege facts showing that she is a member of a protected class and that she was subjected to an adverse employment act. While she does need to show a causal link between the two, she may do so by "rely[ing] on conclusory

allegations that [they] are linked by racial animus." *Murdock-Alexander*, 2016 WL 6833961, at

\*6. At this stage, Slaton-Young's allegations are sufficient to state a claim. She has alleged that

Edward Jones has policies and practices that steer lucrative client accounts and books of business

away from black FAs, that black FAs are routinely placed in less economically viable offices than

other non-black FAs, and that black FAs are routinely denied the mentoring, support, and

advancement opportunities afforded to non-black FAs. Those general allegations mirror Slaton-

Young's allegations specific to her own experience as a black FA at Edward Jones. Thus, the

Second Amended Complaint sufficiently alleges that Slaton-Young's experience was not

anomalous but that discriminating against black FAs was standard operating procedure. *See Radek*

*v. Target Corp.*, No. 16 C 4750, 2017 WL 6733717, at \*4 (N.D. Ill. Dec. 19, 2017) (finding

allegations that employer had pattern of making false allegations against Hispanic employees for

the purpose of firing them to be sufficient at the pleading stage); *Lucas v. Vee Pak, Inc.*, 68 F.

Supp. 3d 870, 878 (N.D. Ill. 2014) (denying motion to dismiss pattern-or-practice claim where

plaintiffs alleged that black workers were not hired when equally or less qualified workers of

other races were, they were subjected to peculiar application requirements, and there were almost

no black workers in the defendant's workforce); *see also Freeman v. Metro. Water Reclamation*

*Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) (per curiam) ("A plaintiff alleging race

discrimination need not allege each evidentiary element of a legal theory to survive a motion to

dismiss . . . . [the plaintiff] needed only to allege . . . that the [defendant] fired him because of his

race.").

       In sum, the Second Amended Complaint alleges that, because of Edward Jones's pattern

and practice of discrimination, Slaton-Young received less compensation than non-black FAs and

suffered other adverse employment actions such as constructive discharge. Consequently, Slaton-Young's allegations are sufficient for her intentional discrimination claim to survive dismissal.

### D. Disparate Impact Claim

Slaton-Young also contends that Edward Jones implements several policies—such as assignment of territories and offices, selection to the Legacy and Goodknight programs, and distribution of client accounts—in ways that disproportionately disadvantage black FAs. In turn, black FAs are compensated significantly less than their non-black counterparts. Edward Jones argues that the allegations in the Second Amended Complaint are insufficient to plead a disparate impact claim because it does not contain any specific factual details demonstrating how such policies disparately impact black FAs.

Under Title VII,[7] an employment practice that has "a disproportionately adverse impact on employees with protected characteristics" is prohibited, "even if the impact is unintended." *Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016). A disparate impact claim may be based on any employment practice, whether facially neutral or subjective or discretionary, so long as it disparately impacts employees in a protected class. *See Adams*, 742 F.3d at 731–32; *see also Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 670 (7th Cir. 1996) ("A plaintiff may demonstrate a violation of Title VII under the disparate impact theory without proving discriminatory intent."). At the pleading stage, for a complaint to adequately state a disparate impact claim, it "must identify a specific employment practice, allege its causation of the disparate impact, and give Defendants fair notice of the claim." *McQueen*, 803 F. Supp. 2d at 907. Furthermore, it must also contain sufficient facts that "plausibly demonstrate an employment policy or practice has caused a relevant and statistically significant disparity between members of affected classes." *Lucas v.*

---

[7] Disparate impact is not a basis for liability under § 1981. *Franklin v. City of Evanston*, 384 F.3d 838, 848 (7th Cir. 2004). Slaton-Young does not contend otherwise.

*Ferrara Candy Co.*, No. 13 C 1525, 2014 WL 3611130, at *3 (N.D. Ill. July 22, 2014) (internal quotation marks omitted).

Edward Jones contends that Slaton-Young's disparate impact claim must be dismissed because her allegations are conclusory and fail to supply facts showing that Edward Jones's policies caused a significant disparity between black and non-black FAs. Instead, she makes bare allegations concerning the disproportionately adverse impact of the policies on black FAs without actually supplying factual details substantiating the disparate impact. But statistical evidence is not necessary to state a disparate-impact claim. *Flanagan*, 2018 WL 558499, at *4. Rather than demonstrating an employment policy's disproportionate effect with "percentages, statistics, or data," a plaintiff "may rely on a variety of statistical methods and comparisons" to support her claims. *Murdock-Alexander*, 2016 WL 6833961, at *7. "[S]ome basic allegations of this sort will suffice." *Id.* And while "the required level of factual specificity rises with the complexity of the claim," *Adams*, 742 F.3d at 733 (internal quotation marks omitted), "where the policy identified is a policy of intentional discrimination . . . . less factual specificity is required to surpass the plausibility threshold," *Flanagan*, 2018 WL 558499, at *5.

While Slaton-Young's claim at first glance is fairly complex, given that it focuses on pay differentials resulting from numerous different potential inputs, the complexity is decreased given her allegations that those inputs are directly influenced by Edward Jones's intentionally discriminatory policies. In particular, she alleges that Edward Jones intentionally applied its policies in a way that disadvantaged black FAs, resulting in decreased compensation and negatively impacting their career advancement opportunities. Courts faced with similar allegations concerning intentional conduct have denied motions to dismiss disparate-impact claims, finding it sufficient that the plaintiff identified the employment policy and provided basic

facts showing an adverse impact on a protected class. *See, e.g.*, *Flanagan*, 2018 WL 558499, at *5 ("It is beyond merely conceivable that a policy of assigning work to Hispanic laborers over African American laborers would result in a disparate impact on African Americans who apply for assignments at Excel."); *Murdock-Alexander*, 2016 WL 6833961, at *8 (denying motion to dismiss where the plaintiff alleged that temporary employer had a policy of hiring Hispanic laborers over black laborers to work for its clients despite failing to supply facts concerning the racial makeup of the relevant racial pool or the percentage of Hispanic laborers that received assignments instead of blacks); *Shirley v. Staffing Network Holdings, LLC*, No. 16 C 6279, 2016 WL 6599951, at *4 (N.D. Ill. Nov. 8, 2016) (denying motion to dismiss where plaintiff alleged that the defendant had "a policy and practice of hiring Hispanic laborers over African American laborers and this policy [had] an adverse impact on a protected class" even though the "only evidence offered in support of this allegation is [plaintiff's] own observations").

In addition, Edward Jones contends that Slaton-Young's claim must be dismissed because she fails to allege how she was directly disadvantaged by Edward Jones's policies. In addition to claiming injury as a result of decreased compensation as compared to non-black FAs, however, Slaton-Young also alleges that Edward Jones reassigned her and another FA to an office located in a less economically-viable territory. Given that Edward Jones FAs are compensated based on commissions, and Slaton-Young alleges that her new office was in a territory that could not sustain two FAs, that is sufficient to constitute an adverse employment action at this stage in the case.[8] *See McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004) ("Adverse employment actions include a broad array of actions such as hiring, firing, failing to promote,

---

[8] There is, of course, the question of whether this reassignment occurred within the 300-day limitations period. But because the Second Amended Complaint does not definitively establish that the reassignment occurred outside that window, the Court will consider it for present purposes.

reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.").

Finally, Edward Jones argues that because its compensation system measures compensation by quality or quantity of production, Slaton-Young cannot challenge that system under a disparate impact theory. Under 42 U.S.C. § 2000e-2(h), an employer may "apply different standards of compensation . . . pursuant to a . . . system which measures earnings by quantity or quality of production" so long as those differences are "not the result of an intention to discriminate." The import of this section "is that disparate racial impact is insufficient under Title VII to invalidate a . . . system which measures earnings by quantity or quality of production. Plaintiffs challenging an employment practice or compensation system of this type must establish intent to discriminate." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 880 (7th Cir. 2012). Slaton-Young does not claim that Edward Jones' compensation system itself is a product of intentional discrimination. Rather, she argues that the inputs that influence FAs' compensation cause black FAs to be compensated less than their non-black counterparts. She claims that § 2000e-2(h) does not foreclose her from challenging the disparate impact of those inputs. Slaton-Young is correct, as this Court finds that § 2000e-2(h) simply acts to insulate the compensation system itself from attack. Indeed, the *McReynolds* court expressly recognized that a challenge to the "disparate impact of the underlying policies that provide the 'inputs'" for compensation would be cognizable. *McReynolds*, 694 F.3d at 879 n.4; *see also Goodman v. Merrill Lynch & Co., Inc.*, 716 F. Supp. 2d 253, 261 (S.D.N.Y. 2010) ("To the extent that other acts of discrimination in violation of Title VII affect the 'inputs' into a . . . production-based compensation system, a plaintiff's remedy lies in challenging those other violations directly.").

In sum, Slaton-Young has adequately stated a Title VII disparate-impact claim. And because she challenges the inputs that affect her compensation under Edward Jones's compensation system, her claim is not foreclosed by § 2000e-2(h). Consequently, Edward Jones's motion to dismiss the disparate impact claim is denied as well.

### E.        Retaliation Claims

Finally, Slaton-Young argues that Edward Jones retaliated against her for reporting racially-charged remarks by her mentor. Both Title VII and § 1981 prohibit "an employer from discriminating against an employee who has opposed any practice made unlawful by Title VII." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Edward Jones does not contest that Slaton-Young engaged in a statutorily-protected activity. Instead, it asserts that Slaton-Young does not adequately allege how the protected activity caused an adverse employment action.

To state a retaliation claim, a "plaintiff must somehow tie the adverse action to her protected activity." *Clark v. SMG Corp.*, No. 16-cv-07985, 2018 WL 4699763, at *4 (N.D. Ill. Sept. 30, 2018). Here, Slaton-Young merely alleges that after reporting the racial remark, she "otherwise suffered retaliation and ongoing race discrimination." (Second Am. Compl. ¶ 32.) Yet she does not plead any facts showing either what adverse employment action was taken in retaliation against her for engaging in a protected activity, or a causal connection between any pleaded adverse employment action and her protected activity. Indeed, Slaton-Young does not attribute a single pleaded adverse employment action to retaliation. For that reason, Slaton-Young fails to state a claim for retaliation, and both the Title VII and § 1981 claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Edward Jones's motion to transfer venue pursuant to 28 U.S.C.

§ 1406 (Dkt. No. 37), is granted in part, its motion to transfer venue pursuant to 28 U.S.C.

§ 1404(a) (Dkt. No. 39) is denied, and its motion to dismiss for failure to state a claim (Dkt. No.

37) is granted in part and denied in part.

ENTERED:

Dated:  November 30, 2020

_____
Andrea R. Wood
United States District Judge