**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| WAYNE BLAND, FELICIA SLATON-YOUNG, and NYISHA BELL, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>EDWARD D. JONES & CO., L.P.,<br><br>    Defendant. | Case No. 18-cv-3673<br><br>Hon. Judge Andrea R. Wood<br>Magistrate Judge Young B. Kim<br>Jury Trial Requested |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiffs Wayne Bland, Felicia Slaton-Young and Nyisha Bell (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Stowell & Friedman, Ltd., hereby file this complaint of race discrimination against Defendant Edward D. Jones & Co., L.P. ("Edward Jones," "Defendant," or "the Firm"), and in support state as follows:

1.    Edward Jones claims to be a leader in the financial services industry and to serve "nearly 7 million investors from more offices than any other investment firm in America."[1] As of year-end 2017, Edward Jones managed over $1 trillion in client assets and employed over 16,000 registered brokers, called Financial Advisors ("FAs"), to service largely individual investors in more than 13,000 locations across the United States.[2]

---

[1] EDWARD JONES, *About Us*, https://www.edwardjones.com/about/index.html (last visited July 27, 2018).

[2] The Jones Financial Companies, L.L.L.P., Annual Report (Form 10-K) (Dec. 31, 2017) at 29, 33, available at https://www.sec.gov/Archives/edgar/data/815917/000156459018005773/ck0000815917-10k_20171231.htm.

2.     African Americans are under-represented both as FAs[3] and in management at Edward Jones, and are paid substantially less than their counterparts who are not African American. These disparities result from the Firm's systemic, intentional race discrimination and policies and practices that serve no reasonable business purpose yet have a disparate impact on African Americans.

3.     Plaintiffs, and the class they seek to represent, allege that Edward Jones employs discriminatory company-wide policies and practices regarding training, compensation, partnerships, and the assignment of territories, sales support, and business opportunities. These discriminatory practices unlawfully segregate the Firm's workforce and deny African Americans income and advancement opportunities because of their race.

4.     Plaintiffs have filed this lawsuit to hold Edward Jones accountable for its unlawful treatment of African Americans and to achieve meaningful reform. This lawsuit is brought by Plaintiffs on behalf of themselves and other African American FAs who work or worked for the Firm and have been harmed by its company-wide pattern or practice of race discrimination and discriminatory policies and practices. This action seeks class-wide injunctive relief and an end to Edward Jones's discriminatory practices.

## JURISDICTION AND VENUE

5.     Plaintiffs' claims arise under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Defendant is licensed to do business and maintains a number of branch offices in this

---

[3] As used herein, Financial Advisors include and refer to both tenured and trainee FAs.

District. Defendant also services clients who are residents of this District. Throughout her tenure at Edward Jones, Plaintiff Slaton-Young resided in, worked for, and was harmed by Edward Jones in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

## PARTIES

7.      Edward D. Jones & Co., L.P. is a wholly owned subsidiary of The Jones Financial Companies, L.L.L.P., a limited liability limited partnership headquartered in St. Louis, Missouri. The Firm earned net revenue of approximately $7.5 billion for the fiscal year that ended December 31, 2017, and it generated $872 million of income before its allocations to partners.[4]

8.      Edward D. Jones & Co., L.P. is registered with the Securities and Exchange Commission as a broker-dealer and is a member organization of the Financial Industry Regulatory Authority ("FINRA"). As part of its brokerage, investment advisory, and financial and wealth planning services, Edward Jones employs over 16,000 registered brokers, or FAs, across the United States.

9.      Plaintiff Wayne Bland ("Bland") is African American and was employed as an Edward Jones Financial Advisor in North Carolina and South Carolina from approximately November 2014 until he was constructively discharged in March 2016.

10.      Plaintiff Felicia Slaton-Young ("Slaton-Young") is African American and was employed as an Edward Jones Financial Advisor in Chicago, Illinois from approximately June 2013 until she was constructively discharged in December 2017.

---

[4] *Supra* note 2, at 28.

11.     Plaintiff Nyisha Bell ("Bell") is African American and was employed by Edward Jones as a Financial Advisor in Stockton, California.  Bell worked for Edward Jones from July 2014 to March 2020, aside from a period between August 2018 and November 2018.

## FACTUAL ALLEGATIONS

12.     Edward Jones maintains stereotypical views about the skills, abilities, and potential of African American employees and clients that infect the Firm-wide policies and practices challenged by this lawsuit. Because of the Firm's stereotypical views and discriminatory employment practices, African Americans are significantly under-represented among Edward Jones FAs, approximately 94% of whom are white. In a 2015 Forbes interview, company Chief Executive Officer Jim Weddle reported that just 6% of Edward Jones FAs were diverse (including Latino, Asian and African American).[5] This is well below the U.S. Census Bureau's reported 21% minority representation for financial advisors nationally.[6] Edward Jones's 6% representation for all minorities even lags behind the nationwide representation of 8.1% for African American advisors alone.

13.     Edward Jones maintains centralized control over its wealth management business from its company headquarters, where an almost exclusively white team of senior executives issues company policies that apply to all FAs. Edward Jones compensates its FAs pursuant to uniform, nationwide compensation plans. The Firm's FAs are compensated based on commissions earned from client accounts and transactions. While not an absolute rule, the greater the value of assets managed by an FA, the greater the FA's potential commissions and

---

[5] Dan Schawbel, *Jim Weedle: Recruiting the Next Generation of Financial Advisors*, FORBES (Mar. 29, 2015), available at http://www.forbes.com/sites/danschawbel/2015/03/29/jim-weddle-recruiting-the-next-generation-of-financial-advisors/2/#9f38a9450f2b.

[6] Elizabeth MacBride, *A Diversity Problem*, InvestmentNews (Dec. 14, 2015), available at http://www.investmentnews.com/article/20151214/FEATURE/151209979/a-diversity-problem (noting that African Americans, Hispanics, and Asians account for 20.9% of financial advisors).

earnings. As FAs achieve greater financial success, they can advance along the compensation model allowing for greater payout and bonuses. Unfortunately, Defendant's uniform, Firm-wide policies and practices (including those regarding training, partnerships, and the assignment of offices, territories, client accounts and other lucrative business opportunities, and administrative and sales support) favor non-African American FAs and result in significant racial disparities in compensation and attrition. These policies and practices are not justified by business necessity but have a disparate impact on African Americans.

14.     The disparities in resources and business opportunities begin during a structured, Firm-wide training program for all new FA hires at Edward Jones ("Training Program"). The Training Program is supposed to provide FAs an equal start, but it disadvantages African American FAs from the beginning of their Edward Jones careers.

15.     The Firm assigns new FAs to one of two paths: as a stand-alone FA working from home, or by being assigned to a "Legacy" or "Goodknight" partnership and office. FAs who are not provided the opportunity to join a Legacy or Goodknight partnership receive minimal support from the Firm and must begin their careers at Edward Jones without a dedicated office, assistance from a Branch Office Administrator ("BOA"), or mentorship from an established FA. FAs assigned to the Legacy program receive dedicated office space, client assistance from a BOA, and mentoring from an established FA. The Firm provides FAs assigned to the Goodknight program office space, mentorship, and an agreement with an established FA to share assets. The dedicated support the Firm provides to Legacy and Goodknight partnerships allows those FAs to attract more clients and accounts than stand-alone FAs. These accounts and clients in turn lead to higher compensation and higher success rates at the Firm. For example, the Firm claims that FAs in Goodknight partnerships have an 80% chance of success, a rate double that of

new FAs whom the Firm does not give such opportunities. However, as a result of racial stereotypes and discrimination, African American FAs are disproportionately excluded from the Legacy and Goodknight programs, to their distinct disadvantage under Defendant's policies. To the limited extent African Americans gain admission to these programs, they do not receive the same support, resources, or business opportunities as non-African Americans. These disadvantages compound as the FAs' careers progress.

16.     The Firm's territory and office assignment policies and practices harm African Americans. The Firm disproportionately relegates African American FAs to territories and offices in less lucrative locations with clients and prospects with less investable income, that are less productive for the FA.  The Firm also impermissibly relies on race and color in assigning territories and often steers FAs by race to match the neighborhood demographics.  The Firm reserves territories with greater investment opportunities for non-African American FAs.

17.     Edward Jones maintains policies and practices that disproportionately steer lucrative business opportunities, including client accounts, to FAs who are not African American. Pursuant to company policies and practices, the Firm assigns client accounts and distributes books of business, in whole or in part, when FAs move offices or leave the Firm. The Firm assigns larger and more lucrative clients, books of business and offices to FAs who are not African American. As a result, African American FAs lose compensation and advancement opportunities.

18.     The Firm's Retirement Transition Plan ("RTP") similarly harms African American FAs by denying them access to the most lucrative client accounts, those of retiring FAs. Under Firm policies, retiring FAs are encouraged or directed to select and partner with other FAs at the Firm to distribute their books of business upon retirement. Edward Jones allows

a retiring FA to transition his or her clients to other FAs, with Firm approval, over a period during which the receiving FA meets the retiring FA's clients. Under these policies and practices, retiring FAs (and/or the Firm) overwhelmingly select white FAs to inherit their books of business. African American FAs are not selected for these lucrative teams and are shut out of large client account transfers.

19.     Edward Jones also employs management grooming and assignment practices that disadvantage African Americans.  White FAs are mentored and assigned titles and jobs that lead to career advancement, while African Americans are denied such opportunities and are largely excluded from management opportunities and promotions.

20.     In sum, Defendant has and is engaged in an ongoing nationwide pattern or practice of race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on African Americans. Defendant's systemic discrimination against African Americans includes, but is not limited to, the following policies and practices:

> a)  failing to hire African American FAs and employing discriminatory recruitment and hiring policies and practices;[7]
>
> b)  employing discriminatory policies and practices regarding the Goodknight and Legacy programs;
>
> c)  employing discriminatory policies and practices regarding the assignment of offices and territory;

---

[7] Plaintiffs do not here assert a hiring class, but do proceed on a pattern or practice theory (among others) of class-wide discrimination under the Supreme Court case of *Teamsters* and its progeny, and so include these allegations as evidence of discriminatory intent and that discrimination was Defendant's "standard operating procedure." *Murdock-Alexander v. Tempsnow Emp't & Placement Servs., LLC,* No. 16 C 5182, 2016 WL 6833961, at *11-12 (N.D. Ill. Nov. 21, 2016) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)) (putative class could use evidence of events beyond statute of limitations to prove whether a discriminatory pattern or practice existed).

d) employing discriminatory policies and practices regarding the transfer and assignment of client accounts, leads, referrals, and other business opportunities;

e) employing discriminatory policies and practices regarding teaming, partnerships, and pooling;

f) employing discriminatory compensation policies and practices;

g) employing discriminatory policies and practices with regard to training and so-called "training costs," resulting in higher rates of attrition and assessment of so-called training costs for African Americans;

h) employing discriminatory policies and practices regarding job assignments, titles, advancement, and promotion;

i) employing policies and practices regarding the assignment of administrative and sales support and other resources and business opportunities that favor whites and harm African Americans;

j) employing discriminatory policies and practices regarding the Firm's Retirement Transition Plan;

k) employing policies and practices that disproportionately disadvantage African American FAs and/or that reinforce, amplify, and continue past discrimination or customer bias;

l) failing to apply and enforce Edward Jones policies in a consistent, race neutral fashion, to the detriment of African American FAs;

m) retaliating against African Americans who complain of discrimination; and

n) terminating African Americans on account of race and/or due to diminished performance and/or production that was lower than it would have been, but for the unlawful conduct of Edward Jones.

21. The intentional and disparate impact discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws. The racially discriminatory policies and practices at Edward Jones are uniform and national in scope. Class members work or worked for Edward Jones across the country and were harmed by these same policies and practices.

**Plaintiffs Were Subjected To and Injured By Defendant's Unlawful Conduct**

22. Throughout their tenure, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Bland, Slaton-Young, and Bell were denied resources and business opportunities, including lucrative client accounts, favorable offices and territories, sales and administrative support, inclusion in favorable broker partnerships or teams and pooled accounts, Retirement Transition Plan opportunities, leads, titles, referrals, and other business and advancement opportunities, because of their race. Bland, Slaton-Young, and Bell were treated worse than similarly situated Edward Jones employees who are not African American, and they lost income and otherwise were harmed as a result of Defendant's unlawful conduct.

23. Plaintiff Wayne Bland joined Edward Jones in 2014 after working in the financial services industry for over a decade. Despite his experience, Edward Jones denied Bland business opportunities and resources regularly given to white FAs at the Firm.

24. After obtaining his licenses, Bland asked to prospect in an affluent and predominantly white neighborhood. Pursuant to its racial steering practices, Edward Jones refused Bland's request and instead assigned a white FA with less experience to prospect in the

affluent neighborhood Bland requested. The Firm assigned Bland to prospect in a lower-income neighborhood with a large African American population. Bland later learned that the Firm knew this assigned territory was not economically viable or capable of sustaining a successful financial advisory business, as the Firm had previously closed an office there for that reason.

25.     Bland was denied the opportunity to join a Goodknight partnership, which would have allowed an established FA at Edward Jones to transfer assets and mentor him. Bland was also initially denied a Legacy partnership and forced to work from his home for a substantial period of time, further hampering his ability to attract clients because he lacked the trappings and legitimacy of a professional office. In contrast, Bland observed that Edward Jones routinely placed non-African American FAs in favorable Goodknight and Legacy partnerships and gave them office space upon hire.

26.     After five months of working from his home and repeatedly requesting access to an office or inclusion in the Legacy or Goodknight programs, the Firm finally allowed Bland access to an office in Lake Wylie. This occurred only because Bland negotiated directly with the senior FA at that office. However, Bland's office was a storage room filled with a dining table, boxes, and office supplies.  Worse, Bland was denied the mentorship, monthly meetings, training and other tangible benefits provided to non-African American Legacy FAs.

27.     When the senior FA who managed the Lake Wylie office left the Firm, Edward Jones assigned the office and the departing FA's tens of millions of dollars in client accounts to a white FA who had begun the Training Program months after Bland and lacked his financial services experience.

28. Throughout Bland's tenure, he was also denied administrative and sales support, RTP partnerships, as well as valuable client accounts and books of business, which the Firm assigned instead to white FAs, including junior white FAs.

29. Although the Firm took little or no interest in Bland's career or professional development, it assigned him the unpaid role of "Diversity Inclusion Specialist" for his region. In this role, Bland saw firsthand the Firm's empty lip-service to diversity and its abysmal commitment to equal employment opportunities. After observing and being the target of racially hostile statements, Bland engaged in protected activity by reporting this misconduct to management, to no avail; worse, the Firm targeted him for retaliation and further discrimination, including by denying him favorable offices (e.g. Lake Wylie) and business opportunities and resources.

30. After informing Edward Jones of racial harassment and being repeatedly denied business opportunities, resources and support, Bland was targeted by management and subjected to enhanced and differential scrutiny, then forced to leave the Firm in 2016.

31. Plaintiff Felicia Slaton-Young joined Edward Jones in 2013. Slaton-Young was well poised to succeed, armed with prior financial services experience, her Series 6 and 63 licenses, and a Master's degree in Business Administration. Despite her qualifications, Edward Jones denied Slaton-Young business opportunities and resources regularly given to white FAs at the Firm.

32. Throughout her tenure, Slaton-Young was denied inclusion in lucrative Legacy or Goodknight programs. However, the Firm routinely granted her white FA colleagues entrance into these partnerships, and Slaton-Young learned about accounts they received as a result. Slaton-Young was also denied managerial support and mentoring and was subjected to racially-

charged remarks by her Firm-sponsored mentor. After Slaton-Young reported this conduct to management, she continued to be denied mentorship and otherwise suffered retaliation and ongoing race discrimination.

33. After Slaton-Young obtained her Series 7 and 66 licenses, Edward Jones placed her in an office already slated for closure. Pursuant to the Firm's racial steering practices, it assigned her to a location in Chicago's predominantly African American south side. This territory was not economically viable or capable of sustaining a successful financial advisory business, as the Firm was well aware. After a turnover of approximately five FAs over two years, the few clients who remained in the office when Slaton-Young arrived were disgruntled and unhappy with Edward Jones.

34. The Firm then moved Slaton-Young to a new location on the south side of Chicago, as part of what it called a pilot program to place two or more FAs in a single location. The other FA selected was also African American, and the two appeared to be "test subjects" selected due to their race. The pilot was launched in a neighborhood with a high African American population and very limited investment or client potential; the territory could not sustain two FAs. The arrangement had no tangible benefit for Slaton-Young; she and the other FA shared office space, but Edward Jones did not allow them to team or pool accounts or clients.

35. Throughout her tenure, Slaton-Young did not receive valuable client accounts, favorable office locations, or participation in RTP teams. Having been denied these and other business opportunities, partnerships, resources and support because of her race and pursuant to the Firm's discriminatory employment practices, Slaton-Young had no choice but to leave the Firm in late 2017.

36.     Plaintiff Nyisha Bell joined Edward Jones in July 2014 with experience in insurance and financial services and a Series 63 license. Despite her qualifications and experience, Defendant denied Bell a Goodknight or Legacy opportunity, while providing such lucrative opportunities, and accompanying client accounts, to her counterparts who were not African American.  Bell developed client accounts due to her own efforts, as she was denied the managerial, sales and administrative support and opportunities provided to her white colleagues.

37.     After Bell achieved can-sell status, and pursuant to the Firm's discriminatory policies and practices, the Firm continued to assign lucrative business opportunities to FAs who were not African American rather than to Bell.  For example, when a long-term FA with over two decades of service and approximately $75 million in client accounts left the Firm's Tracy, California office, the Firm gave the best client accounts, and the vast majority of the book of business, to a white FA (to whom the Firm had previously assigned a Goodknight partnership and related client accounts).  Although Bell's manager told her she would share the office with the white FA, Bell received only a fraction of the client accounts, and even those accounts were smaller and less lucrative.  Bell estimates that the white FA received over 75% of the available assets. In addition, the white FA was placed in an office suitable for meeting with clients, while Bell was relegated to an area previously used as a storage closet. The Firm also denied Bell managerial support and resources.  Among other things, the branch office administrator primarily supported the white FA and serviced her clients, to the detriment of Bell and her clients.

38.     Bell's white Regional Leader ignored her complaints about the unequal treatment, and Bell ultimately escalated her complaints to the Area Leader, who admitted she had not been treated fairly and should have been regarded as an "equal" to her white FA counterpart.

39.     Consistent with the Firm's discriminatory assignment practices, when Bell was finally assigned to her own office, it was a vastly inferior office, with no established clients or book of business, or even an exterior Edward Jones sign. This was in stark contrast to the existing Tracy office that had been in the same, prominent location for nearly three decades and had a prominently displayed "Edward Jones" sign. Worse, the Firm allowed white FAs to interfere with and solicit Bell's clients, contrary to Firm policies and practices. Despite Bell's complaints to management, the poaching continued unabated.

40.     Throughout her tenure, Bell was denied favorable offices, partnerships, client accounts and retirement transition plan opportunities. For example, after an FA left a nearby California office, the Firm assigned nearly all of that FA's client accounts and assets to the white FA in the other Tracy office, rather than to Bell.

41.     Like other African American FAs at Edward Jones, Bell was shut out of retirement plan teams and opportunities throughout her tenure at the Firm. For example, when a long-established white FA with hundreds of millions in client assets decided to retire pursuant to the Firm's Retirement Transition Plan ("RTP"), his entire book of business was transitioned to FAs who were not African American. In anticipation of his retirement, the FA had brought his children in to Edward Jones to succeed him at the Firm, but the book was sufficiently large to warrant distribution to non-family FAs. The Firm assigned a substantial share of the valuable book of business to the white FA to whom it had given the established Tracy office and assets. To better serve her new clients and book of business, that FA was relocated to Woodbridge, California, leaving the Tracy Edward Jones office again available for reassignment.

42.     The Firm again denied Bell the opportunity to take over the highly profitable Tracy office, despite her geographic proximity, knowledge of the clients and market, and

14

previous experience at that same office. Instead, Edward Jones gave the Tracy office to a white FA from another firm in Utah. The new FA then proceeded to poach Bell's clients.

43. Bell complained about the Firm giving business opportunities to white FAs and not to her. Rather than resolving the situation, the Firm targeted Bell for retaliation. The FA was allowed to freely target Bell's clients and accounts, and she was denied client accounts, managerial support, and other resources and opportunities. In light of the escalating retaliation and discrimination, Bell felt she had no choice but to leave the Firm in approximately August 2018.

44. Bell agreed to return to a different geographic location of Edward Jones in November 2018, after the Firm promised her $17 million in assets and a shared office in Stockton. Bell later learned that the assets were substantially lower in value than what she had been promised, and was left without an office or a book of business. Having been denied these and other business opportunities, partnerships, resources and support because of her race and pursuant to the Firm's discriminatory employment practices, Bell had no choice but to leave the Firm in March 2020.

45. Plaintiffs, like other African American FAs, suffered substantial harm as a result of Defendant's unlawful policies and practices. Among other things, Plaintiffs were denied membership in and benefits of favorable teaming relationships due to their race. Although many FAs departed or retired from Plaintiffs' regions, Plaintiffs and others similarly situated were denied valuable client account transfers and distributions. Additionally, Defendant's policies and practices regarding the assignment of territories and resources hindered Plaintiffs and others similarly situated from developing successful businesses and earning income by denying them access to lucrative territories, proper support, resources, and business opportunities.

15

46.     Plaintiffs and others similarly situated lost wages and other benefits, and suffered emotional distress, other nonpecuniary losses, and irreparable injury to their careers as a result of Edward Jones's conduct. Defendant's actions have caused and continue to cause Plaintiffs and others similarly situated substantial losses in earnings, management opportunities, and other employment benefits, in an amount to be determined by a jury.

## CLASS ALLEGATIONS

47.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who work or worked for Defendant as Financial Advisors, including Financial Advisor Trainees, and who were subjected to discrimination by Defendant due to their race. All requirements of class certification are met by the proposed class.

48.     The class of African American employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

49.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

50.     The claims alleged by Plaintiffs are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

51.     Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

52.     The issues of determining liability and equitable relief, among other issues, are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

53. The proposed class also meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I
### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

54. Plaintiffs Bland, Slaton-Young, and Bell, on behalf of themselves and all others similarly situated, reallege paragraphs 1 through 53 and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

55. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

56. Defendant maintained firm-wide discriminatory employment practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

57. Plaintiffs and African American FAs who work or worked for Edward Jones were harmed by Defendant's conduct.

## COUNT II

**RACE DISCRIMINATION IN VIOLATION OF
TITLE VII, 42 U.S.C. § 2000e, *et seq*.**

58.     Plaintiffs Bland, Slaton-Young, and Nyisha Bell, on behalf of themselves and all others similarly situated, reallege the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

59.     All Plaintiffs have filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), which placed Defendant on notice of the representative allegations contained in this Complaint.  Plaintiffs Bland, Slaton-Young, and Nyisha Bell have exhausted their administrative remedies and received their Notices of Right to Sue from the EEOC and filed their individual and class Title VII claims within 90 days of receipt of such notices.

60.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

61.     By its conduct as alleged herein, Defendant unlawfully discriminated against Bland, Slaton-Young, and Nyisha Bell and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

62.     Plaintiffs and other African American FAs who work or worked for Edward Jones were harmed by Defendant's conduct.

## COUNT III

### RETALIATION IN VIOLATION OF
### TITLE VII, 42 U.S.C. § 2000e, *et seq*.

63.     Plaintiffs Bland, Slaton-Young, and Nyisha Bell individually, incorporate all allegations above as though fully stated herein.

64.     Plaintiffs Bland, Slaton-Young, and Nyisha Bell engaged in protected activity by complaining to management of their unlawful treatment.

65.     Plaintiffs Bland, Slaton-Young, and Nyisha Bell suffered retaliation and materially adverse action because of their protected activity, in violation of 42 U.S.C. § 2000e-3(a), and were harmed as a result.

## COUNT IV

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

66.     Plaintiffs Bland, Slaton-Young and Bell, individually, incorporate all allegations above as though fully stated herein.

67.     Plaintiffs Bland, Slaton-Young and Bell engaged in protected activity by complaining to management of their unlawful treatment due to his race.

68.     Plaintiffs Bland, Slaton-Young and Bell suffered retaliation and materially adverse action because of their protected activity, in violation of 42 U.S.C. § 1981, and were harmed as a result.

## COUNT V

**DISCRIMINATION AND RETALIATION IN VIOLATION OF
CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
Cal. Gov't Code § 12960, *et seq.***

69.     Plaintiff Nyisha Bell, on behalf of herself reallege the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

70.     Plaintiff Bell filed a charge of race discrimination with the California Department of Fair Employment and Housing, alleging race discrimination and retaliation.  Plaintiff Bell has exhausted her administrative remedies and filed her individual FEHA claims within one year.

71.     The FEHA makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

72.     By its conduct as alleged herein, Defendant unlawfully discriminated against Plaintiff Bell in violation of the FEHA, under both disparate treatment and disparate impact theories of liability.

73.     Plaintiff Bell was harmed by Defendant's conduct.

### PRAYER FOR RELIEF

WHEREFORE, on behalf of themselves and the class they seek to represent, Plaintiffs respectfully request that this Court find against Defendant as follows:

a.     Certify this case as a class action and certify a class of African American FAs who work or worked for Edward Jones;

b.  Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.  Declare that Defendant's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*;

d.  Declare that Edward Jones engages in a pattern and practice of racial discrimination against African Americans and employs policies and practices that have an unlawful disparate impact on African Americans;

e.  Order Edward Jones to reform it discriminatory policies and practices;

f.  Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiffs whole;

g.  Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Edward Jones's unlawful conduct;

h.  Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i.  Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, and  costs, as provided by law;

j.  Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs; and

k.  Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

STOWELL & FRIEDMAN LTD.

By:____*/s/ Linda D. Friedman*_____

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN LTD.
303 W. Madison Street
Suite 2600
Chicago, Illinois 60606
(312) 431-0888

## <u>CERTIFICATE OF SERVICE</u>

I, Linda D. Friedman, at attorney, hereby certify that on December 30, 2020, I filed the

foregoing ***Third Amended Complaint*** via the Court's CM/ECF system, which caused a copy of

the same to be served upon all counsel of record via ECF.

Respectfully submitted,

By: */s/ Linda D. Friedman*